**Richard T. PLATTNER, d/b/a Jan's Motor Service, Plaintiff,**

v.

**STRICK CORPORATION, a foreign corporation, Defendant.**

No. 83 C 0126.

United States District Court, N.D. Illinois, E.D.

Aug. 16, 1984.

As Amended Aug. 20, 1984.

Paul D. Frenz, Mark S. Rubin, McBride & Baker, Chicago, Ill., for plaintiff.

Eugene R. Wedoff, Elizabeth Vranicar Tanis, Jenner & Block, Chicago, Ill., for defendant.

## MEMORANDUM ORDER

BUA, District Judge.

This matter is presently before the Court on defendant's motion for a new trial and relief from judgment under Rules 59 and 60(b)(3) of the Federal Rules of Civil Procedure. For the reasons stated below, defendant's 60(b)(3) motion is denied. Defendant's motion for a new trial under Rule 59 will be denied if plaintiff accepts remittitur in the amount of $73,895. In the event plaintiff refuses remittitur, defendant's motion for a new trial will be granted limited to determination of "salvage value" of the trailers at issue.

## I. FACTS

Plaintiff Richard T. Plattner, d/b/a Jan's Motor Service ("JMS"), sued defendant Strick Corporation ("Strick") for negligence, strict liability and breach of warranty with regard to alleged defects in 17 flatbed trailers that JMS had purchased from Strick. After a four-day trial, the jury returned a verdict finding Strick not guilty as to JMS' tort claims, but guilty of breach of warranty. The jury awarded JMS "$127,247 less salvage value" of the trailers.

Strick alleges that its post-trial discovery of Illinois State Police documents establishes that the plaintiff, Richard T. Plattner, gave false or deliberately misleading testimony at his deposition and at trial with respect to whether JMS illegally loaded its trailers. Strick also claims that the jury's verdict for JMS on the breach of warranty claim in the sum of "$127,247 less salvage value" cannot support a judgment because the award is excessive and because the jury failed to assess a definite sum for "salvage value."

## II. RULE 60(b)(3) MOTION

■■■ Rule 60(b)(3) of the Federal Rules of Civil Procedure provide in part:

> On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: ... (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party.

Subsection (3) of Rule 60(b) is aimed at judgments which were unfairly obtained, not at those which are factually incorrect.[1] Under the express terms of the Rule, 60(b)(3) motions must be made within a reasonable time, not more than one year, after the challenged judgment was entered. In the year after judgment has been entered, district courts may exercise great discretion in balancing the policy of finality of judgments against the other salutory policies embodied in the alternative grounds for relief provided in subsections (1) through (3) of Rule 60(b). This discretion, as guided by the Rule, furnishes as escape valve to protect the fairness and integrity of litigation in federal courts. *Rozier v. Ford Motor Company*, 573 F.2d 1332, 1339 (5th Cir.1978).

■■■ A Rule 60 motion will be denied if it is merely an attempt to relitigate the case. *Mastini v. American Telephone and Telegraph Co.*, 369 F.2d 378 (2d Cir. 1966); *Cooper Agency v. United States*, 327 F.Supp. 948 (D.S.C.1971). One who asserts that an adverse party has obtained a verdict through fraud, misrepresentation or other misconduct has the burden of proving the assertion by clear and convincing evidence. *Rozier v. Ford, supra*, 573 F.2d at 1339; *Gilmour v. Strescon Industries, Inc.*, 66 F.R.D. 146, 153 (E.D.Pa. 1975), *aff'd without opinion, Bucks County Construction Co. v. P. Agnes, Inc.*, 521 F.2d 1398 (3rd Cir.1975). The conduct must be such that the losing party was prevented from fully and fairly presenting its case or defense. *Toledo Scale Co. v. Computing Scale Co.*, 261 U.S. 399, 421, 43 S.Ct. 458, 463, 67 L.Ed. 719 (1923); *Atchison, Topeka & Santa Fe Ry. Co. v. Barrett*, 246 F.2d 846, 849 (9th Cir.1957). Rule 60(b)(3) applies in situations in which the testimony amounted to either innocent or deliberate misrepresentation. *Bros Inc. v. W.E. Grace Manufacturing Company*, 351 F.2d 208 (5th Cir.1965); *In re Halladay Enterprises, Inc.*, 5 B.R. 83 (S.D.Tex. 1980). Because Rule 60(b)(3) functions to protect the fairness of the proceedings and not the correctness of the verdict, a determination as to whether the allegedly misrepresented testimony served to alter the result of the case is unnecessary. *Seaboldt v. Pennsylvania R.R. Co.*, 290 F.2d 296, 299–300 (3d Cir.1961). *See generally* 11 C. Wright & A. Miller, Federal Practice and Procedure, § 2861 (1970).

---

**1.** Factually incorrect judgments are the subject of Rule 60(b)(2), which provides for relief from a judgment on grounds of "newly discovered evidence which could not have been discovered in time to move for a new trial under Rule 59(b)."

A pivotal question in this case is whether JMS' conduct throughout these proceedings unfairly impeded Strick's preparation for and presentation of its defense of this action to such a degree as to warrant the granting of Strick's motion for relief from judgment pursuant to Rule 60(b)(3) of the Federal Rules of Civil Procedure. The facts relevant to Strick's Rule 60(b)(3) motion are as follows:

The major thrust of Strick's defense at trial is the allegation that JMS had a practice of overloading its trailers, and that the carriage of overloads, not a design defect, was responsible for the cracks in the welds near the kingpin assembly area of the trailers. Strick's post-trial discovery of Illinois State Police documents shows that, between 1978 and 1983, JMS drivers had been issued 47 tickets [2] (2 for gross weight overloads and 45 for rear axle overloads) [3] for overweight violations. Strick contends that the new evidence shows clearly and convincingly that the testimony of the plaintiff "presented an inaccurate story" both before and during the course of the trial which unfairly impeded preparation and presentation of Strick's defense.

In light of Strick's allegations, it is important to identify the individuals who ap-

peared on behalf of JMS during the course of the proceedings. Richard Plattner is the owner of JMS. Rex Plattner is the General Manager of JMS, and, as such, is the person in charge of day-to-day operations of the business.[4]

■ Strick points to four incidents of alleged misconduct in support of its 60(b)(3) motion. First, Strick argues that Richard Plattner's answers to questions concerning overloading, when viewed in light of information revealed by the tickets, amount to misrepresentation of the facts. In the course of carrying approximately 180,000 loads during the six-year period from 1978 through 1983, JMS drivers received two tickets for gross overload violations. Strick urges this Court to construe Richard Plattner's testimony regarding the overloads to have been given to the best of his knowledge or recollection, and furthermore, the Court finds nothing in Richard Plattner's testimony which prevented Strick from fully and fairly presenting its defense to the cause of action for breach of warranty.

Second, Strick claims that Richard Plattner's statements such as "We don't overload" were so misleading that Strick had no reason to subpoena the Illinois State Police

---

**2.** The tickets were issued to the drivers, and not to JMS. It is important to note that the Illinois State Police, Department of Law Enforcement, does not normally contact the owners of the trucks about such violations. Furthermore, the trailers are not ticketed, and therefore it would be difficult, if not impossible, to determine which trailer was being hauled by a ticketed trailer. Affidavit of David Morgan, Assistant Bureau Chief of the Commercial Vehicle Enforcement Bureau, State of Illinois, April 11, 1984.

Strick erroneously asserts that JMS had been convicted at least 69 times for illegal loading. (Defendant's Brief at pg. 9). Twenty-two tickets were issued to drivers operating tractors which JMS had leased to third parties or brokers, or who were, pursuant to JMS' Illinois common carrier authority, employed by third party trucking companies who had licensed their vehicles in the name of "Jan's."

**3.** A "gross weight" violation occurs when the total weight of the tractor, trailer, and load exceeds the maximum limit allowed by the state in which the vehicle is traveling. A "rear axle" overload can often be corrected by either mov-

ing the sliding axle on the trailer or by moving the sliding fifth wheel on the tractor. An overweight on the rear axle of the tractor does not indicate that there has been an overload in the forward end of the trailer. Rather, it merely indicates that the fifth wheel is not far enough forward on the tractor and more weight needs to be distributed to the front axle of the tractor by sliding the fifth wheel forward. Affidavit of Richard T. Plattner, April 13, 1984.

**4.** The following excerpt of Richard Plattner's testimony at trial serves to clarify the chain of command at JMS:

Q [by defense counsel] And at the end of the day, somebody from Jan's goes through the freight bills to make sure that all the loads have been legal. Correct?

A [Richard Plattner] They go through the bills to apply rates to them and bill them, and if there is an exceptional question, it is brought to Rex's attention and then usually to mine.

Trial Transcript at 90.

documents either before or during the course of the trial.[5] However, when reviewing all of the evidence and testimony produced during discovery and at trial, it becomes apparent that Strick is attempting to present these statements out of their true context. For example, Strick twice had the occasion to question Rex Plattner on the issue of overload:

Q [by defense counsel] Are you aware of any situation in which a driver for Jan's hauled a load that exceeded the limitation set by the state, either gross vehicle weight or the per axle weight?

A [Rex Plattner] As far as one particular individual or what?

Q Did it ever occur, as far as you know, at Jan's?

A I am sure it must have.

Q Do you recall any specific incident in which it occurred?

A Not any one in particular. Usually if you have an overload, it's because one side is heavier than the other.

Rex Plattner Deposition Transcript at 24. Furthermore, during cross-examination, the attorney for Strick questioned Rex Plattner as follows:

Q [by defense counsel] Now, you believe it is important, as you testified earlier, to stay within the state limitation on all your loads. Right?

A [Rex Plattner] Yes, sir.

Q But you are not saying, as you sit here now, that there is no occasion where a Jan's driver ever violated the state limitation?

A No.

Q As a matter of fact, you are sure there must be at least one or two occasions of that, aren't you sir?

A I imagine there are, yes.

Trial Transcript at 137–138.

Given Rex Plattner's testimony, the Court finds that the testimony did not prevent Strick from fully and fairly presenting its defense. *See Toledo Scale Co. v. Computing Scale Co.*, 261 U.S. 399, 421, 43 S.Ct. 458, 463, 67 L.Ed. 719 (1923). Rather, it appears that Strick is attempting to remedy its own lack of preparation in failing to obtain the tickets prior to or during the course of the trial. Rule 60(b)(3) is not intended to provide relief in such a situation.

Third, Strick alleges that Richard Plattner's testimony regarding his policy of firing drivers who carried overloads was also seriously misleading and further tainted the proceedings. At trial, the attorney for Strick questioned Richard Plattner as follows:

Q [by defense counsel] Once a driver is discovered to have hauled an overload, he's fired immediately. Correct?

A [Richard Plattner] If he's hauled an overload. I can't remember that far back.

Q Would he be fired? Would that be Jan's policy to fire somebody who hauls an overload?

A A driver? Yes.

Trial Transcript at 91–92. In order for Richard Plattner to fire a driver who carried an overload, it is obvious that Plattner must first have been made aware of the violation. Although it is the policy of JMS to make "spot checks" to ensure that driv-

**5.** When questioned by Strick's attorney on the issue of "overload," Richard Plattner answered as follows:

Q [by defense counsel] So far as you know, from 1978 to the present, no driver of yours has ever carried an overload?

A [Richard Plattner] Not an over gross, no, not with my knowledge.

Richard Plattner Deposition Transcript at 55. At trial, Richard Plattner testified:

Q [by defense counsel] Do you consider it to be an acceptable overload or an acceptable load to go above the state limit?

.    .    .    .    .

A [Richard Plattner] I never consider it acceptable.

Trial Transcript at 81–82.

When asked whether he remembered his deposition testimony quoted above, Richard Plattner answered, "Yes, I do, and I said I don't overload. And I will say it again: We don't overload." *Id.* at 83.

ers do not carry overloads, Richard Plattner made it clear that no one at JMS checks every shipping document in order to discover overweight violations.[6] Neither is it likely that JMS' drivers would volunteer information regarding violations to Plattner. There is nothing in the record to suggest that Richard Plattner either knew or should have known of the overweight violations. Therefore, the Court finds that Richard Plattner's statements regarding his policy of firing drivers who were known to have carried overloads were not misleading and in no way prevented Strick from fully and fairly presenting its defense to the cause of action for breach of warranty.

Finally, Strick alleges that statements made by Richard Plattner and Mr. Frenz, attorney for JMS, regarding Department of Transportation safety compliance audits ("the DOT audits") of JMS during the years 1979 and 1982 unfairly impeded Strick's preparation for and presentation of its defense to such a degree that Strick was prevented from fully and fairly presenting its defense. It is clear that both Richard Plattner and his attorney, Mr. Frenz, made misstatements regarding the contents of the DOT audits.[7] Although the conduct of JMS was not nearly as reprehensible as that of the plaintiff-counterdefendant in *Aloha Airlines, Inc. v. Hawaiian Airlines, Inc.,* 68 F.R.D. 351 (D.Hawaii 1975),[8] this Court finds that the statements made by Richard Plattner and his attorney regarding the DOT audits qualify as misconduct as contemplated by the terms of Rule 60(b)(3). Strick, however, has not met the burden of proving that this particular incident of misconduct prevented Strick from fully and fairly presenting its defense.

The Court is convinced that had Richard Plattner testified to the effect that the DOT audits would not have indicated whether JMS had carried overloads during 1979 and 1982, or had Plattner merely admitted that he did not know whether the DOT audits would indicate whether JMS had carried overloads during 1979 and 1982, it would not "have made a difference in the way [defendant's] counsel approached the case and prepared for trial." *Rock Island Bank & Trust Co. v. Ford Motor Co.,* 54 Mich.App. 278, 220 N.W.2d 799 (1974). Strick was not prejudiced by

6. Plattner testified:

Q [by defense counsel] And at the end of the day, somebody from Jan's goes through those freight bills to make sure that all the loads have been legal. Correct?

A [Richard Plattner] They go through the bills to apply rates to them and bill them, and if there is an exceptional question, it is brought to Rex's attention and then usually to mine.

Q Do they go through the freight bills to determine whether there has been any type of an overload?

A You know, they don't make a habit of looking for an overload because it just doesn't happen, unless it's a permit load.

Trial Transcript at 90–91.

7. When questioned by Mr. Frenz, attorney for JMS, Richard Plattner testified regarding the DOT audits:

Q [by Mr. Frenz] As part of these audits, does the Department of Transportation review your shipping records?

A [Richard Plattner] Yes, they do.

Q Do they check the weights carried?

A Yes, they do.

Q If they find an overload, would that result in a citation?

A Yes, it would.

Trial Transcript at 74–75.

In his closing argument, Mr. Frenz relied on the DOT audits:

There is no proof of this overloading. The documentation that has been submitted clearly indicates that Jan's properly loads their trailers based upon the regulations that have been put out by the government....

And Jan's has had two audits in the last couple of years. Those reports are in evidence in this case showing that they have been audited, their records have been inspected, and there were no findings of violations. There were a couple of violations, but no weight violations, no overweight.

Trial Transcript at 109–110.

8. Aloha's controller and treasurer directed that a second version of an arrangement between Aloha and Budget Rent-A-Car be prepared for the purpose of concealing the actual arrangement from the Civil Aeronautics Board. The CAB auditor's field inquiry, prepared in reliance on the "doctored" version, was later introduced into evidence at trial. Aloha's counsel, Mr. Sakamoto, further obfuscated the situation by relying on the field inquiry during both his examination of witnesses and his closing argument.

JMS' misconduct concerning the DOT audits. This Court is not convinced, as defendant argues, that "if Richard Plattner had given an accurate description of the contents of a DOT audit, then Strick would have been alerted to the fact that drivers employed by JMS had possibly carried overweight loads during the years 1979 and 1982," when Rex Plattner, the General Manager of JMS, had already testified, both during his deposition and at trial, that drivers employed by JMS had operated vehicles in violation of state weight limitations.

The Federal Rules of Civil Procedure are intended to assure a fair contest between litigants. The relief available under Rule 60(b)(3) must be considered in light of the policy protecting the finality of judgments. A motion under Rule 60(b) is addressed to the discretion of the district court, *Ervin v. Wilkinson*, 701 F.2d 59, 61 (7th Cir.1983), and this Court finds that plaintiff's overall conduct did not "assault the fairness and integrity of [the] litigation." *Rozier v. Ford Motor Company*, 573 F.2d 1332, 1346 (5th Cir.1978). Under the unique facts of this case, Rule 60(b)(3) should not be construed so broadly as to defeat the policy of finality of judgments. This Court therefore concludes that Strick has failed to show that the conduct complained of prevented Strick from fully and fairly presenting its defense. Defendant's motion for relief from judgment pursuant to Rule 60(b)(3) of the Federal Rules of Civil Procedure is denied.

## III. EXCESSIVENESS OF VERDICT

Strick argues that the jury's verdict of "$127,247 less salvage value" cannot support a judgment, and that a new trial on the issue of damages should be granted because "salvage value" does not assess a definite sum for damages. Alternatively, Strick contends that if the jury verdict is interpreted as awarding any definite sum in excess of $4,800, then the verdict must be set aside as excessive because the "uncontradicted evidence" presented by Strick showed that the trailers could be repaired for a maximum cost of $4,800.

In determining whether an award is excessive, the Court accords substantial deference to the decision of the jury and will not disturb the award unless the Court is convinced that the award can aptly be described as "grossly excessive" or "monstrous" or with similar pejorative adjectival terms. *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1275 (7th Cir.1984); *Huff v. White Motor Corp.*, 609 F.2d 286, 296 (7th Cir.1979); *Galard v. Johnson*, 504 F.2d 1198, 1199–1200 (7th Cir.1974). The Court is required to make a "detailed appraisal of the evidence bearing on damages," *Grunenthal v. Long Island Rail Road*, 393 U.S. 156, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968), in order to decide "whether the amount is so high that it would be a denial of justice to permit it to stand." *Dagnello v. Long Island Rail Road*, 289 F.2d 797, 806 (2d Cir.1961). *See also Galard v. Johnson, supra*, 504 F.2d at 1200. Upon review of the evidence presented in this case, the Court finds that the jury erred in awarding plaintiff damages in the amount of "$127,247 less salvage value."

Remittitur may be used to cure faulty verdicts in cases in which the defect in the verdict can be traced to a specific misconception on the part of the jury and the effect of that misconception is readily calculable. *Hansen v. Boyd*, 161 U.S. 397, 16 S.Ct. 571, 40 L.Ed. 746 (1896); *Herring v. Luckenbach S.S. Co., Inc.*, 137 F.2d 598, 599 (2d Cir.1943). In this way, the expense and delay of a new trial can be avoided, interference with the jury function is minimal, and the end-product is a verdict identical to that which would have been reached in a completely proper trial. The basic misconception made by the jurors in this case was their belief that the parties, upon review of the proceedings, could agree on a dollar amount which represented the "salvage value" of the trailers. In light of the post-trial motions, it is now apparent that no agreement can be reached. Despite the

jury's misconception, however, "salvage value" is readily calculable from the evidence presented bearing on the issue of damages.[9] The calculations are as follows:

| | |
|---|---|
| Jury's determination of fair market value of trailers before loss (absent defects)[10] | $108,152 |
| (less) | |
| Cost to repair defects[11] | 54,800 |
| (equals) | |
| Salvage value | 53,352 |
| Jury's verdict | 127,247 |
| (less) | |
| Salvage value from above | 53,352 |
| (equals) | |
| Correct award to plaintiff | $73,895 |

Because any award greater than $73,895 would be "grossly excessive," this Court has no option but to enter remittitur. If the plaintiff is willing to accept a remittitur reducing the final award to $73,895, defendant's motion under Rule 59 will be denied. In the event plaintiff refuses remittitur, a new trial, limited to the determination of "salvage value" of the trailers will be granted.

Finally, Strick objects to the amount of costs JMS seeks to recover under Rule 54(d) of the Federal Rules of Civil Procedure. The Court finds that all costs taxed against Strick are fair and proper. The $20 docket fee is authorized by 28 U.S.C.A. § 1923(a). Defendant's motion to review and reduce costs therefore is denied.

## IV. CONCLUSION

Defendant's Motion for a New Trial and Relief from Judgment pursuant to Rule 60(b)(3) is denied. If plaintiff accepts remittitur within 30 days of this order, defendant's motion for a new trial under Rule 59 will be denied. If plaintiff refuses to accept remittitur within 30 days, a new trial limited to the determination of "salvage value" of the trailers will be granted. Defendant's motion to review and reduce costs taxed against defendant under Rule 54(b) is denied. Strick's request for attorneys' fees and costs is denied. JMS' request for attorneys' fees and costs relating to the post-trial motions is denied.

IT IS SO ORDERED.

---

9. While both parties agree that the jury intended that the award (i.e. $127,247) be reduced, Strick argues that $4,800 should be the maximum verdict in this case. JMS has failed to provide the Court with any figure from which this Court can ascertain its opinion as to the dollar amount which should represent "salvage value." In response to Strick's argument regarding reparability, this Court has reviewed the calculations made by the jury in determining the verdict, and the jury clearly contemplated "replacement" of the Strick trailers and did not feel that JMS would be adequately compensated if damages were limited to the amount necessary to repair the defects.

10. Final award ($127,274) less rental expenses ($19,095).

11. It is obvious that the jury rejected defendant's contention that welding alone would repair the defects properly. The figure of $54,800 is calculated by adding Strick's claimed cost of repair ($4,800) and JMS' expert's estimate of the costs of redesign and testing work ($50,000).