SATCORP INTERNATIONAL GROUP
and Sino American Trading
Corporation, Plaintiffs,

v.

CHINA NATIONAL IMPORT &
EXPORT CORPORATION,
Defendant.

No. 94 Civ. 4649 (LAK).

United States District Court,
S.D. New York.

March 13, 1996.

Vincent J. Barra, Barra & Salz, New York City, for Plaintiffs.

Hugh H. Mo, Law Offices of Hugh H. Mo, P.C., New York City, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

The plaintiffs in this action sue the defendant, a corporation organized under the laws of the People's Republic of China ("PRC"), on a default judgment previously obtained by them against one of the defendant's subsidiaries, also a PRC corporation. The theory of the complaint is that the judgment debtor is an *alter ego* of the defendant, which therefore allegedly is responsible for the debt. The defendant moves to dismiss for lack of *in personam* jurisdiction. Plaintiffs counter that (1) the defendant does business in New York because (a) another subsidiary, a New York corporation, is present here and is an *alter ego* of the defendant, (b) the defendant's own employees were involved in the transactions that led to the default judgment, or (c) both, and (2) the jurisdictional defense should be stricken and other sanctions imposed for alleged failure to comply with one of the Court's discovery orders.

### Background

#### The Parties

The plaintiffs in this action are Sino American Trading Corporation ("Sino American"), a Delaware corporation, and Satcorp International Group ("Satcorp"), a New York corporation. Sino American is owned by James Vena and Susan L. Huang. It in turn owns Satcorp International (Hong Kong) Limited ("Satcorp HK"), a Hong Kong corporation. The precise relationship between Satcorp, on the one hand, and Sino American and Satcorp HK, on the other, is unclear, save that Satcorp HK is said to have acted as agent for Satcorp in those respects in which Satcorp HK's actions are relevant to this dispute.

The defendant is China National Silk Import and Export Corporation ("China National"), which is based in Beijing. It has a number of subsidiaries and organizational units, two of which are pertinent here: (1) China Silk Materials Import Corporation, a PRC corporation based in Beijing, and (2) China Silk America, Inc. ("China America"), which is organized under the laws of, and located in, New York.

#### The Contracts and the Default Judgment

In the late 1980's, Satcorp HK, allegedly as agent for Satcorp, contracted to sell China Materials nylon filament yarn which it purchased from U.S. suppliers and caused to be delivered in Shanghai. A dispute arose concerning the failure of the purchaser to return hundreds of thousands of bobbins, as a result of which Satcorp allegedly was forced to make substantial payments to U.S. yarn manufacturers. In 1993, Satcorp sued China Materials in this Court. Apparently unable to serve China Materials within this district, it served process on China America, presumably on the theory that China America was an agent or *alter ego* of China Materials. In due course, Satcorp obtained a default judgment against China Materials in the amount of $1,267,905.90. No application ever has been made to vacate that judgment, which has gone unsatisfied.[1] Frustrated by its inability to collect from China Materials, the plaintiffs then commenced this action on the judgment against China National.

#### Prior Proceedings

This Court held a pretrial conference on March 13, 1995 at which the defendant appeared and indicated that it intended to move to dismiss for lack of personal jurisdiction. The parties expressed a desire for limited discovery in order to prepare for the motion, and a schedule for document production, depositions, and the filing of motion papers was established. The discovery was to have been concluded by the end of April and the motion filed by June 2, 1995. What ensued, however, was little short of a brawl. The lack of cooperation between the parties was remarkable. Repeated discovery applications were made to the Court. The schedule was ex-

---

1. Although the point is not material to the disposition of the motions before this Court, it now appears that China National and China Materials

were well aware of the proceedings in that action but chose to ignore them. (Def.Mem.Exs.DD, EE)

tended. The motion was not fully submitted until late November.

### The Present Motions

China National now moves to dismiss the action pursuant to FED.R.CIV.P. 12(b)(2) for lack of personal jurisdiction. Plaintiffs oppose the motion and, in the alternative, seek to strike China National's jurisdictional defense and deem certain facts established as a discovery sanction pursuant to FED.R.CIV.P. 37 on the ground that China National failed to comply with this Court's August 14, 1995 discovery order.

### Discovery Sanctions

Plaintiffs, as noted, contend that the Court has jurisdiction over China National on the theory, among others, that China America and China National are *alter egos*. Since China America undeniably is present in New York, establishment of the *alter ego* theory would mandate the conclusion that China National also is present here and subject to jurisdiction under N.Y. CPLR § 301. *Volkswagenwerk AG v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir.1984). In consequence, plaintiffs set out to prove that China America in substance is simply a department of China National.

On March 24, 1995, plaintiffs served an amended Rule 34 request, item 27 of which sought production of "[a]ll correspondence, documents, communications between China National and China Silk America, Inc. *relating to business in New York* in 1988, 1989, 1990 and 1994 to the present." (Emphasis added) On May 25, 1995, Zhou Ji, manager of China National's Enterprise Administration Department and a lawyer, testified that China National had no such correspondence. (Ji Dep. 51, 10–11) With the exception of some circulars, notices and the like and, ultimately, certain loan agreements, it produced no written communications be-

tween itself and China America. (Barra Reply Aff. ¶¶ 8–9)

Discovery disputes concerning this and other matters ensued during the spring and summer of 1995, requiring the intervention of the Court. The specific issue of item 27 came before the Court on August 14, 1995, when plaintiffs' counsel castigated China National for allegedly withholding documents, arguing at length that it was inconceivable that there would be no correspondence between the parent and its New York subsidiary, which does over $2 million in sales. (Tr., Aug. 14, 1995, at 4–8) Counsel for China National took great umbrage at the accusation and flatly represented to the Court that there was "[n]o question" that all documents sought by the March 24, 1995 request had been produced. (*Id.* at 9) In view of that representation as well as China National's statement that it had no objection "in principle," and without making any finding as to compliance or lack thereof, the Court directed China National to produce all documents sought by the request and to provide a sworn certification that it had done so. (*Id.* at 11–12; Order, Aug. 14, 1995) The sworn certification thereafter was provided. (Barra Aff. Ex. 1)

There can be no serious doubt that regular business correspondence between China National and China America exists and has not been produced. Plaintiffs manifestly are right in suggesting that it boggles the mind to suppose that it does not, particularly given the close relationship between the two companies that is revealed even by the incomplete record before the Court.[2] But common sense inference is not the sole basis for the conclusion that there is correspondence that has not been produced. There are other indicators, the most important of which is the fact that telephone records for 1994 ultimately produced by China America pursuant to subpoena reveal approximately fifty fax transmissions[3] from China America's New

---

**2.** As discussed more fully below, China America has performed a number of services in New York for China National, including arranging for its participation at one or more trade shows at the Javits Center, purchasing airline tickets, and paying its legal bills in this case. (Biao Dep. 84, 87–88, 96–98, 100 *et seq.*) In addition, China Na-

tional has lent a total of $2.6 million to China America for which loan agreements ultimately were produced.

**3.** China America's fax number is (212) 465–1223. (Barra Reply Aff.Ex. 2) The numbers in Beijing are 5120377, which is Ji's fax line (Ji Dep. 51),

York fax machine to two fax machines at China National in Beijing. (Barra Reply Aff. ¶ 10 & Ex. 5) Yet China National neither has produced the faxes nor explained their absence.[4] Hence, the faxes and almost certainly other correspondence have been withheld. The question is whether the withholding was proper.

The Court acknowledges that item 27, by virtue of the inclusion of the words "relating to business in New York," is not as broad or, perhaps, as clear as it might have been. At a minimum, however, it called for correspondence and other documents between China National and China America concerning business activities in New York, irrespective of by whom conducted. But the affidavit of China National's counsel demonstrates that the defendant placed a far more restrictive interpretation on item 27. Indeed, defendant's may have gone so far as taking the position that since, in China National's view, it does no business in New York, any correspondence with its New York-based subsidiary by definition does not "relat[e] to business in New York."[5] Given its crabbed interpretation of the document request, it is not surprising that defendant produced no correspondence between itself and its New York-based company. The question is whether the interpretation and consequent withholding of documents is sanctionable. The Court concludes that it is on this record.

China National and its counsel were fully aware early in the litigation that the nature and quality of the relationship between China National and China America potentially was dispositive of the jurisdictional defense raised by China National. (E.g., Tr., June 7, 1995, at 11, 13, 17; Tr., Aug. 14, 1995, at 14–15, 17–19) Indeed, in ruling on an application by China America to quash a subpoena, the Court noted:

> "The plaintiff is trying to prove that the defendant and China Silk [i.e., China America] are alter egos, that the corporate form had been and should be disregarded by the court and so on, and therefore it stands to reason that a good deal of material concerning the internal functioning of those companies, and indeed to some degree, financial relationships among them, may well be relevant to that point." (Tr., June 7, 1995, at 17)

Hence, China National knew full well that documents indicative of the relationship between the two companies were relevant.

The fact that additional documentation was relevant but not produced is not alone sufficient to warrant the imposition of sanctions. This district has opted out of the mandatory discovery provision of Rule 26,[6] so it is up to the discovering party's counsel to ask for the discovery he or she wishes and for the other side to respond. There is no obligation to volunteer material simply because it is relevant. China National and its counsel, moreover, had the right to construe the document

---

and 5125125, which is China National's main fax line (Barra Reply Aff.Ex. 4).

4. China National's counsel suggests that some of the entries on the telephone records were for regular phone calls rather than fax transmissions. (Mo.Aff.¶ 6d) But he ignores the undisputed evidence that in each of the instances cited by plaintiffs, both the originating and receiving telephone numbers are fax numbers.

5. The affidavit states:
> "As a matter of record, the 'Item 27' demand extends to correspondence between National and China America relating to 'business in New York.' ... [I]t has always been Defendant's contention ... that National is a parent holding company that does not do business in New York." (Mo. Aff. ¶ 7)
> "Barra's [plaintiffs' counsel's] argument is deceptive in its lack of reference to the actual discovery record; *Barra presumes that Nation-*

*al has not furnished any . 'correspondence' between National and China America.* Nevertheless, Item 27 extends to correspondence relating to 'business in New York.' Presumably, this is why item 27 is a separate category of demand in the first place." (Id. ¶ 8) (original emphasis)
> "The only justification for [plaintiff's] argument relating to Item 27 rests in Plaintiffs [sic ] tortured quotation of an attorney colloquy in the course of the Biao deposition.... Actually, the underlying assumption of these tortured quotations resides in the claim that the Biao testimony betrays existence of loan 'correspondence,' conveniently labeled as such in order to fit the 'Item 27' mold, *and thereby attain status of 'correspondence relating to jurisdiction.'* " (Id. ¶ 10) (emphasis added)

6. S.D.N.Y.Civ.R. 49(a).

request and to resolve the close questions in their favor as long as they acted reasonably and did not mislead. But they went beyond that in this case. Their narrow interpretation of the request, whatever it was, was at or beyond the bounds of good faith to begin with. Any doubt that otherwise might have existed on that score was eliminated when defendant and its counsel learned that opposing counsel took a different view of the scope of item 27. They almost certainly knew, moreover, that the Court never would have stood for the limitation the defendant unilaterally placed upon the document request had it been brought to the Court's attention. Yet they never put their cards face up on the table.

On June 6, 1995, plaintiffs' counsel complained to the Court that defendant had claimed that there were no documents responsive to item 27 among other requests, that Ms. Ji had confirmed that denial at her deposition, and that Ms. Ji, when later confronted with a copy of a letter from China American to China National that plaintiffs' counsel somehow had obtained, admitted that she had seen it before but offered no explanation for why it had not been produced. After some further rhetoric, plaintiffs' counsel stated, "It is inconceivable that a wholly owned subsidiary in New York would have absolutely no communication or documentation with its parent in Beijing over a period of seven (7) years." (Mo.Aff. Ex. F, June 6, 1995 letter, at 3–4)

On the following day, the Court held a conference with counsel in an effort to resolve the discovery disputes. Referring to plaintiffs' letter, it asked defendant's counsel the following question:

"The plaintiff takes the position that your client and these various other entities under common ownership are playing button button, who's got the button, and they would like documents that relate to the relationships between and among the defendant and these other agencies, and your client seems repeatedly to have responded to document requests by denying the existence of documents the existence [of] which stands to reason, and then after the denials are made, copies of which turn up in other people's hands. What's the story?" (Tr., June 7, 1995, at 6)

Defendant's counsel responded by charging plaintiffs' counsel with misrepresentation, by sidestepping plaintiffs' June 6 letter expressing amazement at the lack of any correspondence between China National and China America, and by insisting that China National "is in compliance with the letter of request." (*Id.*) He did not then indicate that he was construing the document request in the manner now advanced,[7] which of course would have (a) explained the failure to produce documents that obviously existed, and (b) tipped off plaintiffs' counsel to the desirability of expressly broadening the wording of item 27.

On July 12, 1995, plaintiffs continued the deposition of China National by Mingxiu Biao, who took over as manager of China America in the spring of 1995. The following revealing exchange took place:

"Q You have seen no correspondence, nothing written, from China Silk America in New York to Beijing in any of the corporate records at China Silk America, is that what you're testifying to? A *I'm not saying that I have never seen any correspondence between China Silk America and China National Import & Export Corporation,* I'm just saying that I have never seen any of the documents regarding these loans that Mr. Lu Chang Sheng entered into with the parent company, any communications.

"Q Mr. Biao, weren't you requested to produce any communications between— anything in writing between China Silk America in New York and the parent for the years '88, '89, '90 and '94 and '95? A *I gave this gentleman all of the documents*

---

7. Later in the same conference, defendant's counsel sought to limit a subpoena to China America to transactions within the State of New York and suggested that opposing counsel had agreed that discovery by China National would be so limited. The Court rejected the suggestion, explaining that no such limitation was appropriate in the context of the *alter ego* issue. (Tr., June 7, 1995, at 13) Defendant's counsel has not relied on this exchange or the alleged agreement in relation to item 27 or the Court's August 14, 1995 order.

*pertaining to the reports of the board of directors and communications.*

"MR. BARRA: *I asked for communications from China Silk America, Inc. to China National in Beijing.* The only documents that were presented to us ... were a series of what appear to be letters, and I had them loosely translated. They are all essentially circulars and notices from China National to its various subsidiaries including China Silk America.

*"My request was specifically for communications, any communications in writing from China Silk America, Inc. to China National.* The only document that I have seen that reflects that is a letter that I produced at the deposition of Ms. Zhou Ji.

"Mr. Mo, I am simply trying to establish here that no other documents have been presented to us which reflect written communications between China Silk America, Inc., and Beijing. I have not received any. I would like to have a representation on the record that either nothing else exists or that we are going to be furnished additional documents. That's all I'm trying to establish here today.

"MR. MO: *All I can say to you is whatever has been requested has been complied with by my office, if that's an answer that you want.* I want the record to reflect that.

"MR. BARRA: *So I take it then that there are no documents in the possession of China Silk America, Inc. that reflect any written communications from New York to the parent in Beijing for 1988, 1989, '90, '94 and '95?*

"MR. MO: *That's correct, in the possession of China Silk America, Inc.*" (Biao Dep. 52–54) (emphasis added)

This exchange thus establishes at least that: (1) there are documents pertaining to the reports of the China America board and communications, and (2) those reports and communications were turned over to China National's counsel. But it does more. It shows that defendant's counsel, confronted with a flat statement that the request reached all written communications between China America and China National, first sought to sidestep the statement by refer-

ring to the written request rather than the oral statement by plaintiffs' counsel and then, when plaintiffs' counsel adhered to his broad description of the request, represented only that there are no responsive documents in the possession of China America. His manifestly deliberate refusal to address the question whether China National possessed documents "that reflect any written communications from New York" to Beijing and his effort to cling to the written request rather than adopting plaintiffs' description of what they required are powerful evidence that he was relying on some narrow, unstated interpretation of the written request to avoid production despite his knowledge that plaintiffs' counsel took a broader view of the request.

On the same day, July 12, 1995, plaintiffs' counsel again wrote to the Court to complain that he "had requested correspondence between the defendant and" China America, but that no such documents had been produced. The Court took up the subject at the hearing on August 14, 1995. China National's counsel, rather than articulating and defending his interpretation of the request, referred to plaintiffs' contentions as "patently untrue and also outrageous ..." (Tr., Aug. 14, 1995, at 10–11) He thus implied (falsely) that there were no communications between the parent and the New York company.

While the drafting of item 27 of the document request, given plaintiffs' objective, perhaps was unfortunate, there was no mystery as to what plaintiffs were getting at. And even if there was doubt at the outset, the doubt was eliminated before very long. By June 6, 1995, defendant knew that plaintiffs' counsel construed the request more broadly than defendant did. By June 7 it knew that the Court shared plaintiffs' view. This knowledge was reinforced at Biao's deposition, by the July 12, 1995 letter, and at the August 14, 1995 hearing. By the time the Court issued the August 14, 1995 order, China National and its counsel were fully aware that it was expected to produce, at a minimum, all correspondence between China National and China America relating to *any* business in New York. But it neither produced that material nor made its position

clear. It thereby violated the August 14, 1995 order, and counsel violated his duty of candor to the Court.[8] The record compels the conclusion the violations were wilful, particularly in view of counsel's repeated failure to put forward his narrow reading of the request in response to statements by plaintiffs' counsel and the Court which evidenced their much broader reading.

■ Rule 37(b)(2) empowers a district court to impose such sanctions as are just for the failure of a party to comply with a discovery order, including the striking of pleadings or parts thereof and deeming facts to be established in accordance with the claim of the party obtaining the order. In determining what sanctions are appropriate in a given case, the court should consider both the sufficiency of less stringent sanctions and the need for deterrence. *See National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976). The sanctions must be just and related "to the particular claim to which the order was addressed." *Daval Steel Products v. M/V Fakredine,* 951 F.2d 1357, 1366 (2d Cir.1991) (citing *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 707, 102 S.Ct. 2099, 2106–07, 72 L.Ed.2d 492 (1982)). But the Court's function is not to search "like Goldilocks, for a sanction advanced by the defendants that is not too hard, not too soft, but one that is just right." *Sieck v. Russo,* 869 F.2d 131, 134 (2d Cir.1989).

Here the defendant had ample opportunity to comply with its discovery obligations. Its failure to produce the material required by item 27 was called to its attention repeatedly *before* the August 14 order was entered. Indeed, that order was entered only *after* China National misleadingly represented to the Court that all requested documents had been produced. Yet it flouted its responsibilities both before and after the order was entered. "Our system of civil litigation cannot function if parties, in violation of court orders, suppress information called for upon discovery." *Rozier v. Ford Motor Co.,* 573 F.2d 1332, 1345 (5th Cir.1978). In these circumstances, a further order to produce would be pointless, particularly in view of the fact that China National is physically located outside the United States and those who have custody of the documents presumably are not personally within the power of the Court.

■ An award of counsel fees to compensate plaintiffs for the cost of the needless discovery to date and of this motion practice certainly is in order, as is a punitive fine. But neither would move plaintiffs closer to their objective, which is a determination as to whether China National is responsible for the payment of the judgment previously obtained against China Materials. Moreover, there are concerns regarding the collectibility of such sanctions.

Plaintiffs seek to have China National's jurisdictional defense stricken and to have the Court deem it established that China National and China America are *alter egos.* That remedy would be a mild one in the circumstances. While it would establish the Court's jurisdiction over China National, it still would leave plaintiffs in the position of having to prove that China National and China Materials are *alter egos* and, if successful, of collecting a judgment against China National. Nevertheless, both the Supreme Court and the Second Circuit have upheld orders striking jurisdictional defenses in comparable circumstances. *Insurance*

**8.** *See, e.g., Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank,* 731 F.2d 112, 123 (2d Cir. 1984) (failure to disclose is fraudulent where one possesses superior knowledge and knows that another is acting on the basis of mistaken information). Even assuming that defendant's narrow interpretation of plaintiff's request in item 27 was reasonable at first, defendant was made aware no later than Mr. Biao's July 12, 1995 deposition that plaintiff's request was far broader than the interpretation given it by defendant. As of that time, at the latest, defendant had a duty to correct its prior denials that it had no documents meeting the description in item 27. FED.R.CIV.P. 26(e)(2). If defendant believed in good faith that its interpretation of item 27 was correct, and that it therefore had no documents that fell within the scope of the request, it should have sought a ruling from the Court. *Rozier v. Ford Motor Co.,* 573 F.2d 1332, 1342 (5th Cir.1978). Failure to do at least one of these things was misleading, amounting in substance to a knowing concealment of discoverable documents. *See Havenfield Corp. v. H & R Block, Inc.,* 509 F.2d 1263 (8th Cir.), *cert. denied,* 421 U.S. 999, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975).

*Corp. of Ireland,* 456 U.S. at 707–08, 102 S.Ct. at 2106–07; *Daval Steel Products,* 951 F.2d 1357. Accordingly, China National's jurisdictional defense will be stricken in addition to the imposition of monetary sanctions.

### The Merits of the Alter Ego Issue

Although the Court has stricken China National's personal jurisdiction defense, it holds, in the alternative, that it has personal jurisdiction over China National on the merits.

■ Plaintiff's principal theory for exercising jurisdiction over China National is that China America, which undeniably is present in New York, is its *alter ego.*[9] As this is a diversity case, this issue is governed by the law of New York. *Volkswagenwerk AG,* 751 F.2d at 120. And under New York law, a foreign corporation is subject to jurisdiction here by virtue of the presence of its subsidiary where the circumstances warrant the conclusion that the subsidiary is a "mere department" of the parent, a determination based on a four factor test. *Id.*

■ The first, and only essential, factor is common ownership, *id.,* which is conceded here.

■ The second is financial dependency of the subsidiary on the parent. *Id.* at 120–21. This may be established where the parent makes a no-interest loan to the subsidiary, where it controls the subsidiary's finances, or where it finances the subsidiary's inventory. *Id.* at 121; *Public Administrator v. Royal Bank,* 19 N.Y.2d 127, 131–32, 278 N.Y.S.2d 378, 381–82, 224 N.E.2d 877, 878–79 (1967); *Taca Int'l Airlines, S.A. v. Rolls–Royce England, Ltd.,* 15 N.Y.2d 97, 101–02, 256 N.Y.S.2d 129, 131–32, 204 N.E.2d 329, 330–31

(1965); *Rabinowitz v. Kaiser–Frazer Corp.,* 198 Misc. 707, 710–11, 96 N.Y.S.2d 642, 644 (Sup.Ct. Kings Co.1950).

The evidence of record concerning the financial relationship between China National and China America, no doubt as a result of the discovery misconduct already referred to, is not extensive. The record shows, however, that China National has loaned an aggregate of $2.6 million to China America. While the loan agreements purportedly require the payment of interest at the rate of 7 percent,[10] China America has paid no principal or interest on the loans.[11] (Biao Dep. 32–40) The substance of the arrangement therefore is consistent with the testimony of Ms. Ji, who said that China National provides all of the capital of its subsidiaries. (Ji Dep. 20) Moreover, the deposition testimony demonstrates that China National, which evidently is limited in its ability to transmit hard currency out of the PRC, causes its profitable overseas subsidiaries to transfer funds to those strapped for cash when the occasion demands. (Biao Dep. 43–47) Taking all of the foregoing together with the conceded fact that China America is a money-losing proposition (Def.Reply Mem.Ex. I), the Court concludes that China America is financially dependent upon China National in the sense necessary to warrant an *alter ego* finding.

The third factor is the parent's involvement in the selection and assignment of the subsidiary's personnel and the observance of corporate formalities. *Volkswagenwerk,* 751 F.2d at 121. In this case, China America at the relevant time had a four member board of directors. One member was its manager, who was employed by China National and resident in New York. (Lu Dep. 4) The other three were China National employees

---

9. Defendant repeatedly has confused the issue of whether China National is subject to jurisdiction on the theory that China America is its *alter ago* with the quite different issue of whether China National is responsible for the payment of the judgment previously rendered against China Materials, another subsidiary. In consequence, its papers on this motion include a farrago of quite irrelevant material.

10. Def.Mem. in Support of Motion to Dismiss Ex. H.

11. Defendant attached to its reply memorandum an unsworn, unsigned statement claiming that interest was paid in 1992 and 1993 together with copies of checks payable to the Bank of China and to Chisicorp (H.K.) Ltd. (Def. Reply Mem.Ex. F) The memorandum asserts that China America's manager, who testified that no payments had been made, was unaware of these alleged payments. (*Id.* at 12) But the deposition was never corrected under oath, and there is no sworn testimony to support the assertion in the reply memorandum. The Court therefore accepts the deposition testimony as it stands.

resident in Beijing. (*Id.* 8–13, 29–30) The board acted annually by consent in lieu of meeting to elect officers. (Pl.Mem. in Opposition to Motion to Dismiss Ex. 7; Lu Dep. 8) The New York manager, however, ran the business and, significantly, reported to the overseas enterprises department of China National (Lu Dep. 29–30) as distinguished from the board. The final factor is the degree of control exercised by the parent over the marketing and operating policies of the subsidiary. *Volkswagenwerk*, 751 F.2d at 121. In view of the fact that the president of China America was employed by China National and reported to its overseas enterprises department, China National plainly exercised substantial operational control over China America. But the full picture is broader.

The PRC is the world's largest producer and exporter of silk, accounting for 70 percent of world production. According to a document published by China National, the PRC's exports of raw silk and grey silk piece goods have been handled since 1988 by China United Silk Materials Import & Export Corporation and China United Silk Gabrics [*sic*] Import & Export Corporation, which are said to be "composed of [China National] and her provincial and municipal branches ..." (Pl. Mem. in Opposition to Motion to Dismiss Ex. 1, at 9) While these relationships are not entirely clear, China National describes itself in the same publication "as a large internationalized, industrialized business group" and states that it has "set up 11 branch offices and 40 joint ventures in China and 15 subsidiaries or representative offices in the major world consuming countries and regions." (*Id.*) A chart of organizational structure contained in the same document lists eleven business units, which are described in functional terms (e.g., executive office, planning, etc.), twelve subsidiaries (including China Materials) and fifteen overseas subsidiaries (including China America). (*Id.* at 10–11) The organization chart depicts all of the various units—i.e., functional business units, subsidiaries and overseas subsidiaries—as reporting to China National's vice president, who in turn is shown as reporting to its president. (*Id.*) Notwithstanding this description, China National and China America witnesses were clear in saying that China

National itself is merely an administrative organization. (Biao Dep. 70, 96) The business, including the business described in the brochure, is carried out by the subsidiaries. (Ji Dep. 68–69, 77–78)

In all the circumstances, the record clearly establishes that China National and its subsidiaries together are the silk exporting arm of the PRC. China National itself is the administrative heart of the organization, while the subsidiaries and other organizations constitute its limbs. Put another way, China National itself, as China America's current president put it, is the "head office" (Biao Dep. 90–94), and it runs the entire organization like any other head office. The role of China America, as the same witness put it, is "to serve the parent company." (*Id.* at 104).

Accordingly, China America is an *alter ego* of China National. Its presence in New York is attributable to China National for jurisdictional purposes. The motion of China National to dismiss for lack of personal jurisdiction would be denied even if the Court had not stricken the defense.

### Conclusion

Plaintiffs' motion to strike China National's defense of lack of personal jurisdiction is granted. China National's motion to dismiss for lack of personal jurisdiction is denied. Plaintiffs shall recover from China National and its counsel, jointly and severally, the reasonable attorneys' fees and expenses, as fixed by the Court pursuant to motion made not later than March 29, 1996, of these motions and of litigating the jurisdictional issue. China National's counsel, Hugh H. Mo, shall pay sanctions to the Clerk of the Court, on or before March 29, 1996, in the amount of $10,000. China National shall not directly or indirectly reimburse counsel, and counsel shall not seek or accept reimbursement, for any part of the $10,000 sanction imposed on him pursuant to this order. Any failure to comply with any aspect of this order may result in further sanctions.

SO ORDERED.