CATSKILL DEVELOPMENT, L.L.C., Mohawk Management, L.L.C., and Monticello Raceway Development Company, L.L.C., Plaintiffs,

v.

**PARK PLACE ENTERTAINMENT CORP., Defendant.**

**No. 00 CIV. 8660 CMGAY.**

United States District Court, S.D. New York.

Oct. 7, 2003.

310

Thomas P. Puccio, Thomas P. Puccio, Esq., New York City, John P. Gallagher, Stites & Harbison PLLC, Atlanta, GA, Bethany A. Breetz, Stites & Harbison, Louisville, KY, Herbert F. Kozlov, Reed Smith, LLP, Andrew L. Frey, Mayer, Brown, Rowe & Maw, Herbert F. Kozlov, Reed Smith, LLP, New York City, William WHopson, J.D. Humphries, III, Stites & Harbison, PLLC, Atlanta, GA, for Catskill Development, L.L.C., Mohawk Management, L.L.C., Monticello Raceway Development Company, L.L.C., plaintiffs.

David Boies, Boies, Schiller & Flexner, L.L.P., Armonk, NY, for Park Place Entertainment Corporation, defendant.

## MEMORANDUM DECISION AND ORDER

MCMAHON, District Judge.

Plaintiffs Catskill Development, L.L.C. ("Catskill"), Mohawk Management, L.L.C.

("Mohawk") and Monticello Raceway Development Co., L.L.C. ("Monticello") (collectively, "Plaintiffs" or the "Catskill Group") move pursuant to Federal Rule of Civil Procedure 60(b)(3) to vacate this Court's decision granting defendant Park Place Entertainment Corp. ("Park Place") summary judgment on plaintiffs' claim for tortious interference with prospective business relations.

For the following reasons plaintiffs' motion is granted, subject to the strict conditions set forth at the end of this opinion.

## BACKGROUND

This case involves the parties' competing efforts to open casinos in upstate New York. Because gambling is illegal in New York State unless on Native American lands and under certain legal conditions, both parties sought to partner with the St. Regis Mohawk Tribe (hereinafter the "Tribe" or "Mohawks").[1]

The Catskill Group's predecessors in interest (a group of businessmen and developers) opened discussions with the Mohawks in 1995 about building and operating a casino at the site adjacent to the Monticello Raceway in Monticello, New York. On June 3, 1996, Catskill (one of the plaintiffs) purchased land in Monticello. And on July 31, 1996 plaintiffs entered into five separate agreements with the Tribe: (1) a "Land Purchase Agreement," whereby the Catskill Group would transfer its land in Monticello to the United States government to be held in trust for the Mohawks; (2) a "Mortgage Agreement"; (3) a "Gaming Facility Management Agreement"; (4) a "Shared Facilities Agreement"; and (5) a "Develop-

ment and Construction Agreement." The casino project these agreements contemplated was subject to regulatory approval by both the federal government and New York State. By April of 2000, plaintiffs had still not received all the necessary approvals despite having spent millions of dollars toward that goal.

Sometime after mid–1999, individuals from President Resorts Casino, Inc. ("President RC"), the company that managed a small casino the Tribe owned on its Akwesasne Reservation near the Canadian border, introduced Park Place principals to members of the Tribe. On April 14, 2000, the Tribe entered into a written agreement with Park Place that gave Park Place exclusive rights to develop and manage any Mohawk casinos in New York State.

On November 13, 2000, plaintiffs filed this lawsuit. Count I of plaintiffs' complaint alleged that Park Place had tortiously interfered with the Catskill Group's contractual relations with the Mohawks (the five agreements). Count II alleged that Park Place had tortiously interfered with plaintiffs' prospective business relations. In a series of decisions that culminated in *Catskill III*, I dismissed Count I on the grounds that no enforceable contract existed between plaintiffs and the Mohawks, an essential element of a tortious interference with contract claim. I granted summary judgment on Count II because plaintiffs could not prove two essential elements of their tortious interference with prospective business relations claim. I first held that plaintiffs had failed to proffer any evidence that Park Place used "wrongful" means to advance its interest in doing business with the Mohawks. I also concluded that plain-

---

1. I have set forth the facts of this case more fully in several previous decisions. *See Catskill Development. L.L.C. v. Park Place Entertainment Corp.*, 217 F.Supp.2d 423 (S.D.N.Y. 2002) ("*Catskill III*"); *Catskill Development,* *L.L.C. v. Park Place Entertainment Corp.*, 144 F.Supp.2d 215 (S.D.N.Y.2001) ("*Catskill I*"), vacated in part, 154 F.Supp.2d 696 (S.D.N.Y. 2001) ("*Catskill II*"). Familiarity with those decisions is presumed.

tiffs could not show that any statement or action by Park Place was the "but for" cause of plaintiffs' failure to consummate their proposed deal and open the Monticello casino.[2] Plaintiffs have appealed my decision to the United States Court of Appeals for the Second Circuit.

On March 14, 2003 plaintiffs moved in this Court, pursuant to Federal Rule of Civil Procedure 60(b)(3), to vacate the judgment I entered in *Catskill III.* Plaintiffs argue that I should grant them relief because Park Place failed to provide them with six audio tapes during discovery. The tapes contain discussions between either Ivan Kaufman (CEO of President RC) or Walter Horn (President RC's in-house counsel) and (1) Clive Cummis (a principal of Park Place), or (2) various representatives of the Tribe, including Paul Thompson (one of the Tribe's three Chiefs) and Gus McDonald (the Mohawk's Tribal Administrator). [Puccio Decl., Ex. M].

## DISCUSSION

As a general matter, Rule 60(b) allows a court to "relieve a party ... from a final judgment, order, or proceeding." Fed. R.Civ.P. 60(b). The rule provides an extraordinary remedy that is granted only when the movant can demonstrate that "exceptional circumstances" justify the relief requested. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1142 (2d Cir.1994) ("[S]ince 60(b) allows extraordinary judicial relief, it is invoked only if the moving party meets its burden of demonstrating 'exceptional circumstances.'"). In

considering relief under Rule 60(b), the Court must weigh plaintiffs' need for substantial justice against the value of preserving the finality of judgments. *See Nemaizer v. Baker,* 793 F.2d 58, 63 (2d Cir. 1986) ("Properly applied, Rule 60(b) strikes a balance between serving the ends of justice and preserving the finality of judgments.").

■ Rule 60(b)(3) provides that a court may grant relief in the case of "fraud ..., misrepresentation, or other misconduct of an adverse party." Fed.R.Civ.P. 60(b)(3). The moving party must demonstrate by clear and convincing evidence that the adverse party engaged in fraud, misrepresentation, or other misconduct. *See Fleming v. New York Univ.,* 865 F.2d 478, 484 (2d Cir.1989), *Buxbaum v. Deutsche Bank AG,* 216 F.R.D. 72, 81 (S.D.N.Y.2003). In addition, the moving party must show that "this conduct prevented [the movant] from fully and fairly presenting his case." *Walther v. Maricopa Intern. Inv. Corp.,* 2002 WL 31521078, at *3 (S.D.N.Y. Nov. 12, 2002) (quoting *Chnapkova v. Koh,* 1992 WL 203906, at *2 (S.D.N.Y. Aug.7, 1992)) (internal quotations omitted). A Rule 60(b)(3) motion cannot serve as an attempt to relitigate the merits. *Fleming,* 865 F.2d at 484.

Park Place argues that, in addition to these requirements, a party seeking post-judgment discovery must also show both a *prima facie* case establishing fraud and a likelihood of success in the action if the discovery were granted. The cases it cites, however, do not involve motions

---

**2.** In order to establish a claim for tortious interference with prospective business relations, a plaintiff must show that (1) there was a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interfered with it; (3) the defendant acted with the sole purpose of harming the plaintiff, or, failing

that level of malice, used dishonest, unfair, or improper means; and (4) the relationship was injured. *Goldhirsh Group, Inc. v. Alpert,* 107 F.3d 105, 108 (2d Cir.1997); *see also Burba v. Rochester Gas & Elec. Corp.,* 139 A.D.2d 939, 528 N.Y.S.2d 241, 243 (4th Dep't 1988). My ruling addressed elements three and four.

brought pursuant to Rule 60(b)(3). Rather, they address claims of "fraud upon the court" that were called to the courts' attention pursuant to the saving clause of Rule 60(b), which provides: "This rule does not limit the power of a court to entertain an independent action to ... set aside a judgment for fraud upon the court." Fed.R.Civ.P. 60(b). *See, e.g., H.K. Porter Co., Inc. v. Goodyear Tire and Rubber Co.,* 536 F.2d 1115, 1118–19 (6th Cir.1976); *Signtech USA, Ltd. v. Vutek, Inc.,* 1999 WL 33290625, at *3 (W.D.Tex. Aug. 9, 1999); *Valerio v. Boise Cascade Corp.,* 80 F.R.D. 626, 646–47 (N.D.Cal. 1978).

Rule 60(b)(3) and Rule 60(b)'s saving clause provide two separate avenues of relief. *See King v. First American Investigations, Inc.,* 287 F.3d 91, 95 (2d Cir. 2002). Parties seeking relief under Rule 60(b)(3), for example, must do so within a year after judgment, while the saving clause contains no such time restrictions. *See Walther,* 2002 WL 31521078, at *3–4. In addition, "fraud upon the court" and the type of fraud that might warrant relief pursuant to Rule 60(b)(3) are not identical. *See Gleason v. Jandrucko,* 860 F.2d 556, 558–59 (2d Cir.1988) ("Indeed, 'fraud upon the court' as distinguished from fraud on an adverse party is limited to fraud which seriously affects the integrity of the normal process of adjudication."); *see also Rozier v. Ford Motor Co.,* 573 F.2d 1332, 1337–38 (5th Cir.1978) (distinguishing between "fraud upon the court" and relief under Rule 60(b)(3)).[3]

Here, plaintiffs have filed a timely motion pursuant to Rule 60(b)(3). I therefore find that the cases defendant cites are inapposite, and I turn to an application of the relevant standard under Rule 60(b)(3).

### I. *Fraud, Misrepresentation, or Other Misconduct*

Plaintiffs served Park Place with their first request for production of documents on November 29, 2000. [Puccio Decl., Ex. D]. Among the documents that plaintiffs requested from Park Place were (1) any documents concerning the Catskill Group and their Monticello Raceway casino project; and (2) any documents concerning communications with the Mohawks (including any member of the Mohawk government), Gus McDonald, and Ivan Kaufman. *Id.* at 8–9. The discovery request defined "document" to include "all electronic media or other tangible form in which information is stored" and "tapes for visual or audio reproduction." *Id.* at 6.

Park Place concedes that the tapes literally fall within the parameters of plaintiffs' discovery request. And Park Place had obtained copies of the tapes as early as May 30, 2001, because they were produced by President RC in a pending state court action brought by President RC against Park Place (the "President Action").

Park Place did not provide the tapes to plaintiffs when it first responded to plaintiffs' request on June 29, 2001, or when it provided plaintiffs with documents responsive to plaintiffs' request approximately a month later. [Plaintiffs' Memorandum 8; Plaintiffs' Reply 1]. Indeed, Park Place's attorneys at the firm of Boies Schiller & Flexner contend that they did not learn about the existence of the tapes until December of 2001, at a meeting with representatives of Park Place and counsel for Park Place and other defendants in the President Action. [Carpinello Decl. ¶ 8]. There is no suggestion in the record that the tapes were in the possession of anyone at Park Place other than its counsel in the

---

**3.** I also note that fraud is but one of three circumstances—the other two being "misrep-resentation" and "other misconduct"—that might call for vacatur under Rule 60(b)(3).

President Action—which, at least at that time, was not Bois Schiller & Flexner. However, when Bois Schiller & Flexner became aware of the tapes, it nonetheless did not produce them as part of a continuing discovery obligation.

Plaintiffs argue it is "extremely unlikely" that Park Place's failure to produce the tapes was not "calculated and intentional." [Plaintiffs' Memorandum of Law 9]. "Rather," plaintiffs contend, "the concealment of the tapes appears to be a deliberate attempt to implement their 'cone of silence,' particularly, in light of the substantial stonewalling by Park Place in discovery in this case." *Id.*

Park Place suggests otherwise.

■ First, Park Place argues that it reasonably believed plaintiffs had already gotten the tapes from President RC in response to a third party subpoena (served in this action) in which plaintiffs demanded from Presidents RC all documents relating to the President Action. That, of course, is irrelevant. The fact that documents in the possession of two parties were believed to have been produced by one of them does not excuse the failure of the second party to respond to a legitimate discovery request.

Second, and more significantly, Park Place's lawyer, George Carpinello, contends that, on or about November 2, 2001, he entered into an express agreement with John Gallagher, representing plaintiffs, to limit the scope of discovery to documents that were in the parties' files prior to litigation, not including documents either side obtained by counsel from third parties during the course of litigation. Mr. Carpinello memorialized his conversation with Mr. Gallagher in a November 9, 2001 letter, which stated:

> As I discussed in my telephone conversation with John Gallagher, both sides

are taking the position that investigative files generated after the commencement of the action are within the work product privilege. Thus, while we will consider requests for specific documents obtained in the course of defending the action, the wholesale production of investigative files is subject to work product privilege.

[Carpinello Decl. Ex. C]. Park Place claims that, pursuant to this agreement, it was under no obligation to produce the tapes.

■ Obviously, Park Place did not engage in misconduct if it acted in full conformity with a mutual agreement with plaintiffs. However, anything less—even Park Place's mistaken belief that it was acting pursuant to such an agreement—could provide grounds to vacate *Catskill III*. That is because even an accidental failure to disclose or produce materials requested in discovery can constitute "misconduct" within the purview of Rule 60(b)(3). *See Schultz v. Butcher,* 24 F.3d 626, 630 (4th Cir.1994); *Jones v. Aero/Chem Corp.,* 921 F.2d 875, 878–79 (9th Cir.1990); *Anderson v. Cryovac, Inc.,* 862 F.2d 910, 923 (1st Cir.1988); *United States v. One Douglas A–26B Aircraft,* 662 F.2d 1372, 1375 n. 6 (11th Cir.1981); *Rozier v. Ford Motor Co.,* 573 F.2d 1332, 1339 (5th Cir.1978); *Progressive Casualty Ins. Co. v. Liberty Mut. Ins. Co.,* 1996 WL 524339, at *2 (S.D.N.Y. Sept. 13, 1996); *Monaghan v. SZS 33 Associates,* L.P., 1992 WL 135821, at *4 (S.D.N.Y. June 1, 1992); *but see Jordan v. Paccar, Inc.,* 97 F.3d 1452, 1996 WL 528950, at *6–7 (6th Cir.1996) (unpublished decision) (concluding that the moving party must show some purposeful "bad act" on the part of the adverse party). As the First Circuit explained in *Anderson:*

> Failure to disclose or produce materials requested in discovery can constitute "misconduct" within the purview of this subsection. "Misconduct" does not de-

mand proof of nefarious intent or purpose as a prerequisite to redress.... The term can cover even accidental omissions—elsewise it would be pleonastic, because "fraud" and "misrepresentation" would likely subsume it. We think such a construction not overly harsh; it takes scant imagination to conjure up discovery responses which, though made in good faith, are so ineptly researched or lackadaisical that they deny the opposing party a fair trial. Accidents—*at least avoidable ones*—should not be immune from the reach of the rule. Thus, we find ourselves in agreement with the Fifth Circuit that, depending upon the circumstances, relief on the ground of misconduct may be justified "whether there was evil, innocent or careless, purpose."

862 F.2d at 923 (emphasis added, internal citations omitted).

If I believe the statements in counsels' sworn affidavits and interpret them most favorably to each party—which I am inclined to do—it appears that Messrs. Carpinello and Gallagher entered into an agreement regarding discovery that each party interpreted differently. Mr. Gallagher believed "the agreement between counsel dealt with work product being generated, i.e., investigative files, not primary evidence of the very transactions and actions forming the basis of Plaintiffs' claims against Park Place." [Plaintiffs' Reply 2]. Mr. Carpinello believed that Park Place did not have to produce any documents that it received from third parties during the course of litigation. I confess that I find Mr. Gallagher's understanding more persuasive, given the literal language of Mr. Carpinello's November 9 letter. To

say that documents produced by a third party in a lawsuit are "investigative files" and constitute "work product" is (charitably) something of a stretch. But attorneys develop different understandings about the meaning of this or that all the time in litigation, and I am not inclined to conclude that defendant's counsel engaged in sharp practice, especially when it is not necessary to the conclusions I reach in this decision.

Had Mr. Carpinello known about the tapes when Park Place responded to plaintiffs' discovery request on June 29, 2001, it appears that Park Place would have provided the tapes to plaintiffs. What apparently changed the calculus was the November 2, 2001 agreement. However, the fact that Bois Schiller & Flexner did not learn about responsive documents until after November 2, 2001 does not absolve it of the obligation to rectify that mistake upon learning about it. And nothing at all in the November 2 agreement—no matter how one interprets it—indicates any agreement by plaintiffs that Park Place's obligation to produce documents that it should have produced months earlier did not continue.

I conclude that the failure to produce was the product of a mistake on Mr. Carpinello's part. However, any mistake was clearly avoidable, since the parties could easily have reduced their agreement to a writing that, by properly defining the terms used, eliminated the possibility of misapprehension by either side. I am thus satisfied that defendant's failure to produce the tapes constituted "other misconduct" pursuant to Rule 60(b)(3).[4]

---

4. Plaintiffs urge this Court to adopt the burden shifting scheme that the First Circuit devised in *Anderson.* I need not do so, however, because even were the plaintiffs unable to show that defendant's "misconduct" was in-

tentional, they have (as I describe below) carried their burden of showing that defendant's misconduct prevented them from fully and fairly presenting their case.

## II. *Plaintiffs' Ability to Fully and Fairly Present Their Case*

■ In order to demonstrate that Park Place substantially interfered with plaintiffs' ability to fully and fairly present their case, plaintiffs need not show that the outcome would have been different absent defendant's misconduct. *See Schultz*, 24 F.3d at 631; *Jones*, 921 F.2d at 879; *Anderson*, 862 F.2d at 924; *Rozier*, 573 F.2d at 1339. Rather, plaintiffs must show that Park Place's "misconduct substantially interfered with [plaintiffs'] ability to prepare the case and defend against the motion fully and fairly." *Monaghan*, 1992 WL 135821, at *3.

■ In the context of an adverse party's alleged failure to produce documents during discovery, plaintiffs must show that the undisclosed material either would have been important as evidence at trial or would have been a valuable tool for obtaining meaningful discovery. *Anderson*, 862 F.2d at 926. They can shoulder this burden by establishing, for example, that "the concealment precluded inquiry into a plausible theory of liability, denied [plaintiffs] access to evidence that could well have been probative on an important issue, or closed off a potentially fruitful avenue of direct or cross examination." *Id.* at 925. In sum, the concealment of evidence did not substantially interfere with plaintiffs' presentation of their case if the evidence "turn[s] out to be cumulative, insignificant, or of marginal relevance." *Id.* at 924.

Plaintiffs identify six ways in which they contend Park Place's failure to produce the tapes prevented them from fully and fairly preparing their case and defending against defendant's motion for summary judgment.

**First**, plaintiffs argue that the tapes demonstrate that Cummis acted as a businessman in his dealings with the Mohawks, not only as a lawyer for Park Place. The tapes contain, for example, the following discussion:

Horn: Okay. Okay. You've been basically saying to us you were in a spot to do the deal and you're also a lawyer.

Cummis: Yeah.

Horn: You have that unique -

Cummis: Yeah.

Horn:—dual role.

Cummis: I'm wearing two hats.

Plaintiffs contend that this discussion, as well as others on the tapes, demonstrates that Cummis wrongly asserted the attorney-client privilege during discovery.

However, this statement is cumulative. Even without the tapes, plaintiffs were aware that Cummis acted as a negotiator with the Mohawks. Indeed, when they opposed Park Place's motion for summary judgment, plaintiffs argued that certain statements Cummis made to the Tribe during negotiations constituted "wrongful means." *Catskill III*, 217 F.Supp.2d at 437. Plaintiffs were free to go to the Magistrate Judge at any time if they thought Cummis's assertion of attorney-client privilege was wrongful. I fail to see how the tapes would have provided plaintiffs with information allowing them to gain any appreciable amount of additional discovery.

**Second**, plaintiffs contend that, during a crucial period of time when the Tribe appeared to equivocate over reaching an agreement with Park Place, Cummis (1) scheduled a meeting with Patrick Kehoe from the Governor's office, and (2) told the Tribe that Kehoe said (at the meeting) that the Governor would not approve the deal for a casino in the Catskills without Park Place's involvement. Plaintiffs assert that the following statement made by Cummis on the tapes supports their version of events: "I am going to meet with

the Governor's office to find out what is happening with the tribe."

Plaintiffs are in error. No reasonable juror could draw an inference about who called the meeting from the statement quoted in the preceding paragraph. And, assuming *arguendo* that Cummis called the meeting, that does not tend to establish that Cummis told the tribe that the Governor's office said it would only approve the deal if Park Place was involved. In short, this is bootstrapping, pure and simple.

**Third**, plaintiffs refer to a discussion between Cummis and Horn in which Cummis states that the Mohawks wanted to open a casino with Park Place in Monticello, but the Tribe would prefer if Park Place "could switch it to Kutchers without any significant loss of time." According to plaintiffs, this statement demonstrates that the Tribe relied on Cummis's representation that, were Park Place to open a casino with the Mohawks, the necessary approvals would happen in short order. This quoted statement (a) says no such thing, and (b) would be of marginal relevance if it did. While it tends to establish that the Mohawks were generally concerned with the timing of their casino projects, it is a stretch and then some to draw the inference that plaintiffs contend is compelled by these words. The record already contains a plethora of information tending to show that the Mohawks were concerned about not losing any more time in going forward with a Catskills casino project—particularly since they had been working with plaintiffs for five years and had no casino to show for it.

The rest of plaintiffs' arguments involve the financial pressure the Tribe felt due to a need for funds at its Akwesasne casino, and whether Park Place wrongfully took advantage of the Tribe's need for a cash infusion at the casino in order to obtain an exclusive from the Mohawks. In *Catskill III*, I found that Park Place's insistence on an exclusive development contract as a quid pro quo for a $3 million loan (for the ailing Akwesasne casino) did not constitute wrongful economic pressure. 217 F.Supp.2d at 437–38. Plaintiffs continue to claim that Park Place's actions in this regard constitute wrongful means, and they cite two particular portions of the tapes to support their arguments.

First, plaintiffs point to a discussion between Ivan Kaufman and Paul Thompson that they argue evinces the following scenario: The Tribe initially told Park Place that it was already involved with plaintiffs on a pending project in the Catskills and would only negotiate with Park Place for future projects. Park Place agreed to this limitation. Park Place also agreed to provide financial assistance to the Mohawks' ailing Akwesasne casino prior to any negotiations regarding future casinos in the Catskills. In February of 2000, however, Park Place insisted that the Tribe give them exclusive rights to any casino development in the Catskills. By that time, the Tribe could not back out of its relationship with Park Place because (1) the "cash crunch" at Akwesasne casino had become more pronounced, (2) the Tribe had turned away other "suitors" who could have helped solve the "cash crunch" without insisting on an exclusive; and (3) the Tribe had already wasted valuable time and resources by commencing negotiations with Park Place. [Tape 1; Transcript Pages 1–10].

Second, plaintiffs point to the following conversation between Cummis and Kaufman, which appears to have occurred soon after the Tribe agreed to grant Park Place an exclusive:

Kaufman: ... But I don't know if they're [the Tribe] going to go back and change at this point. But you got to

remember the pressure on them with how we're squeezing them in Akwesasne is huge. I mean they—you know, I have kind of delayed their payrolls and -

Cummis: Yeah.

Kaufman:—slowed it down so badly that, you know, they're looking at Arthur [Goldberg, Park Place's CEO] as the savior.

Cummis: Yep, they are.

Kaufman: And it is great. I mean I never would have thought that you would have gotten where you have gotten, but I guess Arthur is a genius.

Cummis: He's pretty good. I'm not bad. He's pretty good.

Kaufman: You must be a hell of a team.

Cummis: Yeah.

Kaufman: I mean I have been around a little bit, but not as much as you guys. But to take a situation—remember we started with our letter of intent and they said never would they give an exclusive.

Cummis: Yeah.

Kaufman: But you guys can maneuver. I'm impressed.

Cummis: They've given it to us now. . . .

[Tape 4; Transcript Pages 3–4].

According to plaintiffs, these two conversations support either or both of two theories of liability. They argue that the conversations tend to show that Park Place (1) exerted the type economic pressure that can constitute wrongful means, even when committed by one who is normally privileged to exert pressure (i.e., a competitor), see Scutti Enterprises, LLC v.

*Park Place Entertainment Corp.*, 322 F.3d 211, 216–17 (2d Cir.2003); or (2) employed wrongful means by tortiously interfering with President RC's fiduciary obligations toward the Tribe. *See Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 206 (2d Cir.1998) (explaining that "[a] knowing breach of fiduciary duty may also, if it satisfied the usual common law elements, amount to a fraud or misrepresentation" and, therefore, tortious interference with a fiduciary duty can "constitute[ ] wrongful means sufficient to support a tortious interference with contractual and prospective business relations claim").[5]

With regard to plaintiffs' arguments based on Kaufman's statement that he was "squeezing" the Tribe, I note that Park Place did nothing that would constitute wrongful means—under either of plaintiffs' theories of liability—if President RC "squeezed" the Tribe but Park Place was not involved in that activity. If the evidence were to show, for example, that President RC slowed payroll but Park Place had no knowledge whatsoever of that fact (yet benefitted from it), then Park Place did not employ wrongful means. Similarly, Park Place did not engage in wrongful means if it merely *knew* that President RC was squeezing the Tribe. Park Place's conduct must, at the very least, rise to the level of "knowing participation." *See Hannex*, 140 F.3d at 203 (explaining that proof of wrongful intent is not necessary to make out a claim of tortious interference with fiduciary duty, "knowing participation" in the breach is

---

5. Park Place argues that in order to make out a claim for tortious interference with fiduciary duty, plaintiffs must show that President RC breached a fiduciary duty toward them. That does appear to be the normal posture of cases brought under this cause of action. Under New York law, however, a plaintiff must establish three elements: "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that the plaintiff suffered damages as a result of the breach." *Id.* at 203 (quoting *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 847–48 (2d Cir.1987)) (internal quotations omitted). Thus, plaintiffs need only establish a breach of a fiduciary duty *to another* that caused them some "pecuniary harm." *Id.*

sufficient); *see also S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 848–50 (2d Cir. 1987) (construing "knowing participation"); *Kaufman v. Cohen*, 307 A.D.2d 113, 760 N.Y.S.2d 157, 170 (1st Dep't 2003) (construing "knowing participation").

Thus, Kaufman's statement that he was "squeezing" the Tribe by slowing the Tribe's payroll down "so badly that ... they're looking at Arthur [Goldberg, Park Place's CEO] as the savior," coupled with Cummis's rather non-committal responses ("Yeah" and "Yep, they are"), is not as facially damning as plaintiffs would have this Court believe. No reasonable juror could infer from those statements, without more, that Park Place either conspired with President RC to slow down payroll or substantially assisted President RC to breach its fiduciary duty to the Tribe.

Similarly, the conversation that plaintiffs argue establishes that Park Place led the Tribe "down the primrose path" and then demanded an exclusive does not, on its face, tend to show that Park Place employed wrongful means. Park Place was not required to adhere to a single position during its negotiations with the Tribe, regardless of the outside pressures on the Tribe to enter into the exclusive agreement with Park Place.

In other words, had the tapes been before the Court on defendant's motion for summary judgment, it would not have changed my conclusion that plaintiffs failed to raise a genuine issue of material fact concerning "wrongful means." As I explained above, however, plaintiffs need not show that the outcome of the lawsuit would have been different if the missing evidence had been produced earlier. They need only show that the withheld evidence would have been a valuable tool for obtaining meaningful discovery into some theory of liability. Had plaintiffs' counsel possessed the tapes, they would have been

fodder for cross examining the participants in the conversations, and other witnesses as well. Additionally, I imagine that plaintiffs' counsel would have made more specific inquiry into the possibility of a conspiracy or interference with fiduciary duty, both of which were "plausible theor[ies] of liability." *Anderson*, 862 F.2d at 926.

### III. *Weighing Substantial Justice Against the Finality of Judgments*

To prevail on a tortious interference with business prospects theory, plaintiffs must prove all four elements: a prospective business relationship, intentional interference, malice or wrongful means, and injury to the relationship caused by the malicious or wrongful interference. In *Catskill III*, I granted summary judgment on plaintiff's tortious interference with business relations claim because no reasonable jury could find either that Park Place used "wrongful means" or that plaintiffs would have consummated their proposed business transaction with the Mohawks but for Park Place's actions. Either ground was sufficient, in and of itself, to dismiss the complaint.

With respect to wrongful means, a jury could infer from the tapes that President RC slowed payroll, the economic pressure that slowing payroll produced forced the Tribe to agree to an exclusive with Park Place, and Park Place knew that President RC was slowing payroll. This, in itself, is insufficient to make out wrongful means. To make out a case based on their breach-of-fiduciary-duty theory of liability, for example, plaintiffs would still have to show that (1) President RC knowingly breached a fiduciary duty to the Tribe; (2) the breach satisfied the usual common law elements of fraud or misrepresentation; and (3) Park Place "knowingly participated" in President RC's breach by providing "substantial assistance." These are issues that

plaintiffs did not have the opportunity to develop during discovery.

Yet reopening the judgment so that plaintiffs can further explore the issue of wrongful means appears unlikely to alter the result in this case. Despite plaintiffs' valiant efforts to convince me otherwise, the tapes relate only to the issue of wrongful means. Nothing on the tapes has the slightest relevance to the issue of "but for" causation. Plaintiffs cannot use their discovery of the tapes' non-production to reopen the record on that issue—especially when what plaintiffs quite obviously seek to do is supplement the record with evidence about recent developments in the political and judicial arena (none of it definitive as yet) in order to speculate about what might now happen if the Tribe still had a commercial relationship with plaintiffs. The Tribe abrogated that relationship in 2000—three years ago. The "but for" causation issue comes down to whether *at that time* (i.e., in the year 2000) there were so many hurdles that plaintiffs needed to jump so that a reasonable jury could find that they would have ended up with a valid agreement with the Tribe. "After-acquired" evidence of recent developments is irrelevant.

Thus, if I vacated the judgment, and plaintiffs thereafter developed evidence, through further discovery, that raised a genuine issue of fact on the wrongful means issue where none was raised before, it seems that I would still grant summary judgment in favor of defendants, because plaintiffs failed to raise an issue as to but for causation—an alternative ground for my decision in *Catskill III* that is in no way affected by discovery of the tapes.

The question then becomes, will denying the motion have some impact on the pending appeal? That, it turns out, depends on what the Court of Appeals chooses to do and why. If the Circuit reverses the judg-

ment dismissing Count II for any reason, there is no practical impact. If it affirms the judgment dismissing Count II because plaintiff failed to raise a genuine issue of fact concerning "but for" causation, then whether it agrees or disagrees with my analysis of "wrongful means"—or even addresses the issue—is irrelevant. Only if the Court of Appeals concludes that I erred in finding no genuine issue of material fact on "but for" causation, but upholds the judgment because plaintiffs failed to raise a disputed issue of fact concerning "wrongful means," will plaintiffs suffer any prejudice. In that case, however, they would have been precluded from fully and fairly presenting their case on the question that proved dispositive on appeal.

█ Of course, "final judgments should not 'be lightly reopened.'" *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir.1986) (quoting *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 401 (5th Cir.1981)); *see also Griffin v. Swim–Tech Corp.*, 722 F.2d 677, 680 (11th Cir.1984) ("The desirability for order and predictability in the judicial process speaks for caution in the reopening of judgments."). But despite my undoubted respect for the finality of a judgment, substantial justice counsels in favor of vacatur to allow plaintiffs a brief opportunity to take discovery on the issue of wrongful means (but only insofar as it relates to the possibility of a conspiracy to exploit the financial trouble of the Mohawks at Akwesasne or Park Place's tortious interference with President RC's fiduciary duty toward the Tribe) and then re-present that one limited issue to this Court.

Here, the judgment's finality does not weigh as heavily as it might under other circumstances. First, the case was decided on a motion for summary judgment. Thus, the same amount of judicial resources have not been expended as there

would have were the case to have been heard by a jury. Second, the undisclosed tapes only involve one small part of my holding in *Catskill III:* the wrongful means portion. In other words, the finality of the large majority of my decision remains unaffected. Third, the Court of Appeals has not yet ruled on plaintiffs' appeal; indeed, it has not heard oral arguments. I will decide the issue and the parties will be able to bring their appeal on a full record.

## CONCLUSION

For the reasons stated above, I grant plaintiff's motion to vacate judgment in defendant's favor on plaintiffs' tortious interference with prospective business relations claim (Count II in plaintiff's complaint). Discovery is opened for thirty days from the date this decision becomes effective. Plaintiffs may conduct discovery concerning the "plausible theories of discovery" the tapes suggest: Park Place's conspiracy with President RC to "squeeze" the Tribe and Park Place's tortious interference with President RC's fiduciary duty. Discovery is limited to those discrete issues. It shall be conducted on a highly expedited basis, under the strict supervision of Magistrate Judge Fox (who will preside in the absence of Magistrate Judge Yanthis, who is currently on leave). Parties have only two days to object (48 hours) to discovery requests, and they must object by faxing a letter to the Magistrate Judge so that they can obtain an immediate ruling. If parties do not produce witnesses under their control for deposition within two days (48 hours) of the original date for which the witness is noticed, I will entertain motions to preclude the offering of evidence or the making of arguments. The Magistrate Judge is directed to enter orders directing recalcitrant third party witnesses to appear on pain of contempt. In other words, no stonewalling and no hiding behind someone else to stonewall.

At the end of the thirty day discovery period, plaintiffs have seven days to file a twenty page (no longer) supplemental brief on the issue of wrongful means. This brief must contain within its text the transcript of any record references (testimonial or documentary) on which they rely to raise a disputed issue of fact on the subject of wrongful means. Defendants have seven days to file opposition papers, and plaintiffs will have three days for a reply. I will not entertain any requests for extension of time for any reason. The briefs must be in ordinary type-face and may not include footnotes.

Both parties have asked that I permit them to go forward with oral argument on the appeal from the decision granting defendant's motion for summary judgment on Count I. I decline to certify Count I for separate appeal. I am reasonably certain the Court of Appeals wants to hear and dispose of this case at one time and, in any event, I do not believe that my disposition of Count I raises any issue that meets the criteria for an interlocutory appeal.

This is the decision and order of the Court.